*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DONTE DODSON,

        Defendant-Appellant.

UNPUBLISHED
May 25, 2023

No. 360021
Wayne Circuit Court
LC No. 19-000475-02-FC

Before: RICK, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for first-degree murder, MCL 750.316, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, under a theory of aiding and abetting. Defendant was sentenced to life imprisonment without parole for the first-degree murder conviction and two years' imprisonment for the felony-firearm conviction. We affirm.

## I. BACKGROUND

This case arises from the fatal shooting of Britteny Campbell in August 2018. A few hours before the shooting, Campbell, defendant, Deja Davis,[1] and Asia Berry were together at Berry's house on Pingree Street in Detroit, Michigan. Defendant and Davis are cousins. At one point during the night, Davis began fondling Campbell's breasts and between her legs. Campbell told Davis to stop and warned him that she would "mace" him if he did not stop. Davis continued to fondle Campbell, and she pulled a can of mace out of her bra and sprayed Davis in the face with the mace. Demesio Lee, a friend of Campbell, came to pick up Campbell and take her home. Lee brought Campbell back to Berry's, however, to retrieve some items that she had left behind. When

---

[1] In a separate jury trial, Davis was convicted of first-degree murder, MCL 750.316, felon in possession of a firearm, MCL 750.224f, and felony-firearm, MCL 750.227b. This Court affirmed his convictions in *People v Davis*, unpublished per curiam opinion of the Court of Appeals, issued December 16, 2021 (Docket No. 351935).

Davis asked her why she sprayed mace at him, Campbell revealed a handgun while reiterating to Davis that he should not touch her.

At some point after Campbell left, defendant asked those present where Campbell lived and then left Berry's house. Defendant's brother-in-law, Calvin Chandler, testified that defendant came to his house that night for about five minutes sometime between 10:00 p.m. and 11:30 p.m. Chandler lived at the corner of Wildemere Street and Columbus Street. In his initial statement to the police, Chandler stated that he had a .45-caliber handgun in a box in his bedroom at the time in question.[2] Additionally, on the night of the crime, defendant was wearing a GPS tether, which was able to track the location of the tether to an accuracy of 3 to 5 feet. The GPS tether records showed that defendant was at Berry's house until 10:50 p.m. and then at Linwood Street (near where Chandler lived) at 10:55 p.m. At 12:10 a.m., the GPS tether pinged at Dexter Avenue, which is near Campbell's house on Euclid Street. Defendant's GPS tether then pinged again at Chandler's house at 1:00 a.m.

Lee eventually dropped Campbell off at her house on Euclid Street around midnight. As Campbell was walking toward her front door, Lee noticed a red Dodge Durango driving up the street with its headlights off. Lee heard Campbell say, "Oh, what do you want," before hearing multiple rapid gunshots. The Durango then drove past Lee and fled the scene. Lee contacted the Detroit Police Department, and Campbell later died of her injuries at the hospital. The autopsy report concluded that the cause of death was nine gunshot wounds to the body, including two shots to the head. The autopsy concluded that the wounds came from a .45-caliber handgun.

After the incident, defendant was taken into custody and questioned by Detroit Police Department Detective Gentry Shelby. Defendant admitted he owned a red Dodge Durango and had used it to drive Davis to Campbell's house on the night of the shooting. Defendant said that he knew Davis wanted to go to Campbell's house because Davis was upset with Campbell over the mace incident. Defendant stated he believed Davis was going to "beat the victim's a**" and that he was okay with Davis beating Campbell. Defendant also was aware that Davis was armed with a handgun when defendant drove Davis to Campbell's house. When defendant dropped off Davis at Campbell's house, he heard rapid gunshots and believed that Campbell was dead. Defendant filed a motion to suppress his statements made during his interrogation with Detective Shelby, which the trial court denied.

At trial, Davina Sturgis testified that, two weeks after the shooting, she received a phone call from someone she believed to be Davis. Sturgis had been friends with Davis since childhood and recognized his voice. Davis told Sturgis that on the night of the incident, Campbell had sprayed him with mace and that he had asked around to find out where she lived. Davis said that "he took his cousin['s] truck and went and got a gun from his cousin['s] house, or took a gun from

---

[2] On September 13, 2018, police obtained and exercised a search warrant for the Columbus residence. Chandler was present at the time, and police found the case and holster for a .45-caliber handgun, but not the gun. Chandler testified at trial that he sold the gun at some point in 2017 or 2018. Chandler said he had no record of the sale, but sold it to a man named "Ern," who he knew only through Facebook. During trial, the prosecution presented evidence of Chandler's Facebook profile, which contained no contacts to or from a person named "Ern" or "Ernest."

his cousin['s] house and went and waited on [Campbell]." Davis stated the gun was taken from a house on "Wildemere and Columbus." Davis told Sturgis he used a "red Durango" to get to Campbell's house and that when Campbell arrived she said, "What the **** are you doing here," and pulled out her gun. Davis believed that Campbell shot him first before he "shot her with two guns." Sturgis asked Davis what he did with the gun, and Davis replied that "he put it back at his cousin['s] house so he don't never know [sic]."

Davis's cellphone records showed that he and defendant exchanged several phone calls in the hours following the shooting. Additionally, Ryan Haugh (a data analyst) and Corporal Allen Mosley of the Wayne County Sheriff's Department testified as to data of the GPS tether defendant wore before, during, and after the crime. At the close of trial, defendant was convicted of first-degree murder and felony-firearm under an aiding and abetting theory for helping Davis with the crime.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel was ineffective for failing to object to (1) Sturgis's testimony regarding Davis's statements and (2) admission of evidence relating to defendant's GPS tether.[3] We disagree.[4]

"Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016). To prevail on a claim of ineffective assistance of counsel, a defendant "must establish (1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000).

### A. DAVIS'S STATEMENTS TO STURGIS

Defendant argues the testimony of Sturgis was inadmissible, and thus, his trial counsel was ineffective for failing to object to Sturgis's testimony. We disagree.

---

[3] The argument regarding the GPS tether evidence, as well as the challenge to the trial court's denial of defendant's motion to suppress, were made in defendant's Standard 4 Brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

[4] Because the trial court did not hold an evidentiary hearing regarding defendant's claim of ineffective assistance of counsel, our review is limited to errors apparent on the record. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). "Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Anderson*, 322 Mich App 622, 627-628; 912 NW2d 607 (2018) (quotation marks and citation omitted). "[A] trial court's findings of fact, if any, are reviewed for clear error, and questions of law are reviewed de novo." *Id*. at 628.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Unless, the rules of evidence provide otherwise, hearsay is inadmissible. See MRE 802.

Defendant argues that Davis's statements were inadmissible hearsay and did not fall within either MRE 801(d)(2)(A) (statement by a party opponent) or MRE 801(d)(2)(E) (statement by a coconspirator during the course of and in furtherance of the conspiracy). However, defendant does not address the hearsay exception in MRE 804(b)(3), which allows for admission of statements that are made against a declarant's penal interest. MRE 804(b)(3) provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true [is not excluded by the hearsay rule].

"The premise underlying this hearsay exception is the common-sense intuition that a reasonable person would be expected to lie, if at all, only in his own favor, and would not harm himself by his own words." *People v Kowalski*, 492 Mich 106, 128; 821 NW2d 14 (2012) (quotation marks and citation omitted).

In *People v Taylor*, 482 Mich 368, 378; 759 NW2d 361 (2008), the Supreme Court addressed whether a codefendant's hearsay statement was admissible against the defendant under MRE 804(b)(3). A witness testified at trial as to statements the codefendant made during a telephone call; during the call, the codefendant described a detailed account of the victim's murder. *Id*. at 379-380. Because the statements were made informally to an acquaintance and not "during a police interrogation or other formal proceeding," the Court held that they were nontestimonial and therefore did not implicate the Confrontation Clause. *Id*. at 378. Accordingly, the admission of the statements was governed solely by MRE 804(b)(3) under the following standard:

> [W]here, as here, the declarant's inculpation of an accomplice is made in the context of a narrative of events, at the declarant's initiative without any prompting or inquiry, that as a whole is clearly against the declarant's penal interest and as such is reliable, the whole statement—including portions that inculpate another— is admissible as substantive evidence at trial pursuant to MRE 804(b)(3). [*Id*. at 379 (citation omitted).]

The Supreme Court concluded that the codefendant's statements "constituted a 'narrative of events,' [and] so the statements were admissible at trial in their entirety." *Id*. at 380.

Here, Davis's statements to Sturgis were similarly admissible under MRE 804(b)(3). This Court has already upheld the trial court's finding that the identity of the person who called Sturgis was Davis. See *People v Davis*, unpublished per curiam opinion of the Court of Appeals, issued December 16, 2021 (Docket No. 351935), pp 3-4. This Court held that "the trial court did not err by determining that the prosecution had proved by a preponderance of the evidence that Davis was the individual who made the statements during the phone call." *Id*. Further, Sturgis identified

-4-

Davis as the caller when she first spoke with the investigators. At trial, Sturgis testified that she recognized Davis as the caller and that she had known Davis since childhood. And there is no dispute that Davis was "unavailable" as a witness given the charges against him and his Fifth Amendment right not to testify. See MRE 804(a)(1).

As in *Taylor*, Davis's statements to Sturgis were nontestimonial because they were made informally over the phone to an acquaintance. Davis stated he had obtained a gun from his cousin's house and had gone to Campbell's house to "wait on" her. Davis also told Sturgis that when he shot Campbell, "it was like an action movie." We conclude these statements were against Davis's penal interests because they are probative of the intentional killing of a human and premeditation, both of which are elements of first-degree murder. See *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Additionally, a reasonable person in Davis's position would have realized his statements were incriminating. To the extent that the statements implicated defendant,[5] they were admissible because they were made as a part of a "narrative of events." *Taylor*, 482 Mich 367.

Thus, because Davis's statements were admissible under MRE 804(b)(3), we conclude any objection made by defendant's trial counsel would have been futile. Because an attorney is not ineffective for failing to make a futile objection, defendant failed to show how his trial counsel's performance fell below an objective standard of reasonableness, and his ineffective-assistance claim fails. See *People v Woolfolk*, 304 Mich App 450, 457; 848 NW2d 169 (2014); *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

## B. GPS TETHER EVIDENCE

Defendant argues that his trial counsel was ineffective for failing to object to the testimony presented at trial concerning defendant's GPS tether. We disagree.

Under MRE 401, "relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "[T]he threshold is minimal: any tendency is sufficient probative force." *People v Feezel*, 486 Mich 184, 197; 783 NW2d 67 (2010) (quotation marks and citation omitted). Relevant evidence may be excluded under MRE 403, which provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

At trial, Haugh and Mosley testified as to the data regarding the location of the GPS tether defendant was wearing before, during, and after the crime. The evidence was presented to establish that defendant aided and abetted Davis in the shooting of Campbell. The GPS tether records showed that defendant drove near Campbell's house around the time of the crime. The shooting

---

[5] Davis's statements to Sturgis generally indicated that he acted alone. But when she asked what he did with the truck after the shooting, Davis replied that "*we* parked it at the corner of Pingree." (Emphasis added). When asked who he was with, Davis said that he was by himself.

occurred shortly after midnight, and the records, which have an accuracy of 3 to 5 feet, showed defendant was on the street near Campbell's house at 12:10 a.m. Further, the records also placed defendant near Chandler's house before the shooting and again after the shooting, which supports a reasonable inference defendant went to Chandler's house to retrieve the handgun and later went back to return it. The GPS tether evidence also supports that defendant drove Davis to Campbell's house before the shooting. Thus, the GPS tether evidence was sufficiently relevant because it had tendency to make the existence of these facts more probable.

Additionally, we disagree with defendant's argument that the testimony concerning the GPS tether data was simply cumulative because the prosecution had already presented cellphone record evidence. The cellphone records admitted into evidence were those of Davis's phone, not defendant's. Further, the cellphone data places the user in a general vicinity on a cellphone tower map, whereas the GPS tether records have a heightened accuracy of 3 to 5 feet. No other evidence presented placed defendant as accurately at Campbell's house before the shooting. Thus, we conclude the GPS tether evidence was not a needless presentation of cumulative evidence. Likewise, while the evidence was damaging to defendant, the probative value of the testimony was not substantially outweighed by any unfair prejudice.

Therefore, because the GPS tether evidence was relevant (and was not cumulative or unduly prejudicial), any objection to it would have been futile. Because counsel is not ineffective for failing to raise futile objections, defendant has failed to show how his trial counsel's performance fell below an objective standard of reasonableness. See *Woolfolk*, 304 Mich App at 457; *Thomas*, 260 Mich App at 457.

## III. MOTION TO SUPPRESS

Defendant next argues that the trial court erred by denying his motion to suppress his statements to the police. We again disagree.[6]

Before a suspect in custody may be questioned by the police, the suspect must be advised of his right to remain silent and his right to have an attorney present. See *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966). See also *People v Cortez (On Remand)*, 299 Mich App 679, 691; 832 NW2d 1 (2013). A defendant may waive these rights so long as they are waived "voluntarily, knowingly, and intelligently." *People v Daoud*, 462 Mich 621, 633; 614 NW2d 152 (2000) (quotation marks and citation omitted). "The voluntariness of a defendant's statements is determined by examining the totality of the circumstances surrounding the interrogation." *People v Gipson*, 287 Mich App 261, 265; 787 NW2d 126 (2010). Further, once a defendant invokes the right to counsel, the police must terminate the interrogation immediately. See *People v Tierney*, 266 Mich App 687, 710-711; 703 NW2d 204 (2005). "However, the defendant's invocation of his right to counsel must be unequivocal." *Id*. at 711. "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to

---

[6] "We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress." *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009).

-6-

counsel, our precedents do not require the cessation of questioning." *Id*. (quotation marks and citation omitted).

Defendant argues that he effectively invoked his right to counsel by presenting Detective Shelby with his attorney's business card before the interrogation began and therefore he should have never been questioned. However, Shelby testified that defendant did not request an attorney either before or during the interrogation. Defendant also never asked to stop the interrogation, and Shelby was the only person defendant had contact with during the interrogation. Even assuming that defendant did in fact provide Shelby with an attorney's business card, that was not sufficient to assert defendant's right to counsel. The assertion of this right must be unambiguous and unequivocal; an ambiguous or equivocal request does not require an officer to stop his questioning. See *Tierney*, 266 Mich App at 711. In *Tierney*, the defendant stated, "Maybe I should talk to an attorney." *Id*. The *Tierney* Court concluded this statement was equivocal, and thus, the defendant had not asserted his right to counsel. *Id*. Similarly, in *People v Adams*, 245 Mich App 226, 236; 627 NW2d 623 (2001), when the officers informed the defendant of his right to counsel, the defendant responded, "Can I talk to him right now?" The *Adams* Court concluded the defendant's statement was ambiguous, and the following interrogation of the defendant was not unlawful. *Id*. at 238. Here, handing a detective an attorney's business card is similarly ambiguous and equivocal. Thus, Shelby was not required to stop the interrogation.

Further, we conclude that defendant voluntarily waived his right to remain silent, and therefore, the trial court did not err when it denied defendant's motion to suppress his statements. Before the interrogation started, Shelby advised defendant, then 27 years old, of his constitutional rights to remain silent and to have an attorney present. These rights were listed on a form provided to defendant before the interrogation. Defendant then read the list of rights out loud. Detective Shelby then asked defendant if he had any questions regarding those rights; defendant said he did not. Defendant then initialed next to each of the rights and signed the form.

Defendant argues that his statements were made while he was intoxicated, and thus, the statements were involuntary. But Shelby, who had police experience interacting with people under the influence of drugs and alcohol, testified that defendant did not appear to be under the influence of alcohol when he signed the rights form or during the interrogation. Defendant did not tell Shelby that he was intoxicated, and defendant never asked to stop the interrogation. Further, intoxication from alcohol "is not dispositive of the issue of voluntariness." *People v Akins*, 259 Mich App 545, 566 n 18; 675 NW2d 863 (2003). Defendant was also given water during the interview, which took place during the day. Thus, based on the totality of the circumstances, we conclude defendant was aware of his right to remain silent and that he voluntarily and knowingly waived this right when he answered Shelby's questions during the interrogation. Thus, the trial court did not err when it denied defendant's motion to suppress his statements made during the interrogation.

## IV. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that there was insufficient evidence to establish beyond a reasonable doubt that he committed the crimes of first-degree murder and felony-firearm under an aiding and abetting theory. We disagree.[7]

The elements of first-degree murder are "(1) the intentional killing of a human (2) with premeditation and deliberation." *Bennett*, 290 Mich App at 472. "A defendant may be vicariously liable for murder on a theory of aiding and abetting." *Id*. The elements of aiding and abetting are

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Id*. (quotation marks and citation omitted).]

In this case, defendant argues that there was insufficient evidence presented that he intended to kill Campbell or that he knew Davis intended to kill Campbell. In *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006), the Supreme Court explained that the intent element may be satisfied by proving beyond a reasonable doubt "that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense." In that case, the defendant drove his codefendant to the victim's house and was aware that the codefendant intended to assault the victim. Both the defendant and the codefendant approached the victim's house, and when the victim opened the door, the defendant initiated the assault and struck the victim multiple times. *Id*. at 4. The defendant declared that "that was enough" and returned to the car; the codefendant then shot and killed the victim. *Id*. The Supreme Court concluded that a "natural and probable consequence of leaving the enraged [codefendant] alone with the victim is that [the codefendant] would ultimately murder the victim." *Id*. at 12 (quotation marks and citation omitted). Thus, the defendant's murder conviction was upheld because he aided and abetted the murder. *Id*. at 12-13.

Here, defendant and Davis were upset with Campbell after the mace incident and both of them had asked around to find out where she lived. Defendant told the police that he knew Davis was going to Campbell's house because Davis was upset with Campbell and that Davis intended to harm her. Further, defendant admitted to the police that he knew Davis had been armed with a

---

[7] "We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). We "examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine[s] whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *Id*. at 196. "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of the crime." *People v Head*, 323 Mich App 526, 532; 917 NW2d 752 (2018). "With regard to an actor's intent, because of the difficulties inherent in proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v McKewen*, 326 Mich App 342, 347 n 1; 926 NW2d 888 (2018) (quotation marks and citation omitted).

handgun when they got into the car to go to Campbell's house. Indeed, the evidence supports the conclusion that defendant obtained the weapon from his brother-in-law's house and returned it after the shooting. This is significant because it shows that the plan called for a firearm instead of Davis merely physically assaulting Campbell. Viewed in a light most favorable to the prosecution, this was sufficient evidence presented for a reasonable jury to conclude that defendant either intended Campbell's murder or knew that Davis intended to murder her.

Alternatively, even accepting as true defendant's statement to the police that he believed that Davis was only going to "beat" Campbell, the totality of the circumstances supports the conclusion that a natural and probable consequence of defendant leaving Davis alone with Campbell was that Davis would shoot her. Similar to the defendant in *Robinson*, defendant was aware that Davis was angry with Campbell before the assault, escalated the situation by helping to obtain a gun for Davis, and drove Davis to Campbell's house. See *id*. at 11-12. Further, defendant and Davis knew that Campbell was armed, which made it very unlikely that Davis would only physically assault Campbell without use of the gun.

For these reasons, we conclude that there was sufficient circumstantial evidence presented at trial for a reasonable trier of fact to find defendant guilty of aiding and abetting the murder beyond a reasonable doubt.

To convict a defendant of felony-firearm under an aiding and abetting theory, the prosecutor must prove:

> [A] violation of the felony-firearm statute was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that assisted in the commission of the felony-firearm violation, and that the defendant intended the commission of the felony-firearm violation or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. [*People v Moore*, 470 Mich 56, 70-71; 679 NW2d 41 (2004).]

Here, as concluded above, there was sufficient evidence to establish that defendant, as an aider and abettor, was guilty of first-degree murder. Accordingly, there was sufficient evidence presented at trial for the jury to also convict defendant on the charge of felony-firearm under an aiding and abetting theory.

Affirmed.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien